FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA 14 DEC 19 AM 10: 56

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS, FLORIDA

THE UNITED STATES OF AMERICA

*ex. rel.*

**FILED UNDER SEAL**

LAWRENCE WALDMAN and PATRICIA CLARK,

Plaintiff,

v.

Civil No.: _____

JOANNE T. KOWALSKI;
ACE HOMECARE LLC;
BROOKDALE HOME HEALTH, LLC (FORMERLY
KNOWN AS INNOVATIVE SENIOR CARE HOME
HEALTH OF TAMPA, LLC);
BROOKDALE SENIOR LIVING, INC.;
COMPREHENSIVE HOME CARE OF SOUTHWEST
FLORIDA, LLC;
COMPREHENSIVE WELLNESS SERVICES, INC.;
INFINITY HOME CARE, LLC;
INFINITY HOME CARE OF PORT CHARLOTTE, LLC;
NURSE ON CALL, INC.; AND
NURSE-ON-CALL HOME CARE, INC.,

2:14-cV-716-FtM-38CM

Defendants.

## COMPLAINT

Plaintiff, the United States of America *ex rel.* Lawrence Waldman and Patricia
Clark, alleges as its Complaint against defendants as follows:

### Introduction

1.      This is an action to recover damages, treble damages, and penalties on
behalf of the United States of America on account of false and fraudulent claims made or caused
to be made by defendants, their agents, employees, and co-conspirators, in violation of the
Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended (the "FCA").

**EXHIBIT "A"**

(5-3)

purpose of receiving payments to which defendants are not lawfully entitled to receive for the reimbursement of Medicare costs incurred for home health care services.

3.      Defendants are engaged in a scheme to bypass the requisite physician involvement in health care for thousands of home-bound patients by using forged physician signatures.

4.      Not only are defendants profiting illegally, they are jeopardizing patient care by depriving patients of physician involvement in their care.

5.      In particular, defendant JoAnne T. Kowalski works in the greater Fort Myers area as an advanced registered nurse practitioner ("ARNP"). Kowalski and the other defendants are engaged in a conspiracy to defraud Medicare.

6.      As defined by Florida law, an ARNP is a licensed nursing professional who is "certified in advanced or specialized nursing practice." Fla. Stat. § 464.003(3). This includes certified registered nurse anesthetists, certified nurse midwives, and nurse practitioners.

7.      According to Rule 64B8-35.002, Florida Administrative Code, ARNPs like Kowalski "shall only perform medical acts of diagnosis, treatment, and operation pursuant to a protocol between the ARNP and a Florida licensed physician, osteopathic physician or dentist."

8.      Kowalski has a collaborative practice agreement with physician Julio Conrado, M.D., whom  Kowalski pays $750 per month for this arrangement. Dr. Conrado's office is at 5030-A Mason Corbin Ct., Fort Myers, Florida, 33907.

9.      In furtherance of this scheme, Kowalski has, on thousands of cases, forged the signature of Dr. Conrado on various documents and forms that are a condition of Medicare reimbursement.

10.   Kowalski's scheme, with which the corporate defendants are complicit, involves bypassing required physician approvals, her forgery of physician signatures, and the other defendants' knowing reliance on them.

11.   This scheme has generated millions of dollars of false claims. Kowalski and the corporate defendants have profited significantly by this fraudulent scheme.

12.   In this way, defendants are submitting false claims and/or causing false claims to be submitted to Medicare, which Medicare then pays.

13.   By forging Dr. Conrado's signature and falsely certifying that he had approved the health care plans for home-bound patients, Kowalski ensures that the corporate defendants — who provide the health care services under those plans — are paid by Medicare, and typically paid far more quickly than if a physician had actually reviewed and certified (or altered) the plans.

14.   Kowalski, in turn, also benefits in numerous ways. She is paid for each patient visit she makes to prepare an order. The more orders she can write, the more money she makes. Because she fraudulently certifies the health care plans, her services are in demand. Kowalski also benefits by making regular visits to patients before their health care plans can be re-certified. She is able to perform more of these visits because her scheme has made her services in high demand.The FCA provides that any person who knowingly presents, causes to be presented, or conspires to present, a false or fraudulent claim to the United States of America for payment or approval is liable for a civil penalty of between $5,500 and $11,000 for each false or fraudulent claim submitted or paid, plus three times the amount of damages sustained by the United States of America from the payment of such fraudulent claims. The FCA's *Qui Tam* provisions further allow any person having information regarding a false or fraudulent claim

- 3 -

fraudulent claim against the United States of America to bring an action for himself or herself (as the "relator") and for the United States of America, and to share in any recovery.

15.     Based on these provisions of the FCA, Waldman and Clark, as relators and original sources, seek to recover damages, treble damages, and civil penalties arising from false claims made to the United States of America that were knowingly presented or caused to be presented to, and were paid by, the United States of America as a result of the acts of defendants and their agents, employees, and co-conspirators.

16.     Defendant Kowalski, along with Defendants Ace Homecare LLC, Brookdale Home Health, LLC (formerly known as Innovative Senior Care Home Health of Tampa, LLC), Brookdale Senior Living, Inc., Comprehensive Home Care Of Southwest Florida, LLC, Comprehensive Wellness Services, Inc., Infinity Home Care, LLC, Infinity Home Care of Port Charlotte, LLC, Nurse On Call, Inc., and Nurse-On-Call Home Care, Inc. (collectively, the "corporate defendants"), and their employees, agents, and co-conspirators on their behalf, systematically submitted to the United States of America false and fraudulent claims for improper Medicare payments.   As a result of these knowingly false and fraudulent claims, defendants received payments from the United States of America to which they were not entitled.

17.     The frauds at issue here violate the FCA both before and after its May 2009 amendment.

### Parties

18.     Relator Lawrence Waldman is and was, at all times relevant to this Complaint, a resident of Miami, Florida.   Waldman has personal knowledge of the facts alleged in this Complaint and is acquainted with defendants and their business practices.   Waldman was

a senior vice president at Defendant Comprehensive Wellness Services, Inc., a large home health provider that both hired and worked with Kowalski. Waldman has been in the home health industry for seven years.

19.     Relator Patricia Clark is and was, at all times relevant to this Complaint, a resident of Fort Myers, Florida. Clark has personal knowledge of the facts alleged in this Complaint and is acquainted with defendants and their business practices. Clark has been in the home health care industry for ten years.

20.     Clark was hired by Kowalski in 2012 to assist Kowalski with billing and business recordkeeping. As a result, she has access to Kowalski's electronic and paper business records.

21.     Waldman and Clark bring this action for violations of 31 U.S.C. sections 3729, *et seq.* on behalf of themselves and the United States of America pursuant to 31 U.S.C. section 3730(b)(1). The allegations of this action are based upon their personal knowledge, unless otherwise described as being made upon information and belief.

22.     Waldman and Clark are the original sources of the factual allegations of this Complaint within the meaning of section 3730(e)(4)(B) of the FCA.

23.     Upon information and belief, Defendant Kowalski resides at 17050 Coral Cay Lane, Fort Myers, Florida. Her activities have been conducted in the Middle District of Florida.

24.     Upon information and belief, Defendant Ace Homecare LLC is a limited liability company organized under the laws of the State of Florida, with a principal office for the transaction of business located at 9210 King Palm Drive, 112, Tampa, Florida, 33619.

25.     Upon information and belief, Defendant Brookdale Home Health, LLC ("Brookdale Home Health") is a limited liability company organized under the laws of the State of Delaware, with a principal address of 111 Westwood Place, Suite 400, Brentwood, Tennessee, 37027.  Brookdale Home Health is registered to do business in the State of Florida, with a registered agent CT Corporation System located at 1200 South Pine Island Road, Plantation, Florida, 33324.   Upon information and belief, Brookdale Home Health is affiliated with Defendant Brookdale Senior Living, Inc.   Until March 2014, Brookdale Home Health was named Innovative Senior Care Home Health of Tampa, LLC ("Innovative").   Thus, any reference to Innovative is a reference to Brookdale Home Health, and vice versa.

26.     Upon information and belief, Defendant Brookdale Senior Living, Inc. ("Brookdale Senior Living") is a publicly held corporation organized under the laws of the State of Delaware, with a principal address of 111 Westwood Place, Suite 400, Brentwood, Tennessee, 37027.  Brookdale Senior Living is registered to do business in the State of Florida, with a registered agent CT Corporation System located at 1200 South Pine Island Road, Plantation, Florida, 33324.  Brookdale Senior Living is affiliated with Defendant Brookdale Home Health, LLC.  In 2014, Brookdale Senior Living acquired Emeritus Corporation by merger (through a subsidiary).  Upon information and belief, Emeritus Corporation owns Defendants Nurse On Call, Inc. and Nurse-On-Call Home Care, Inc., as well as Nurse-On-Call of Broward, Inc., and Nurse-On-Call of South Florida, Inc.

27.     Upon information and belief, Defendant Comprehensive Home Care Of Southwest Florida, LLC ("Comprehensive of Southwest FL") is a limited liability company organized under the laws of the State of Florida, with a principal office for the transaction of business located at 33920 US Highway 19 North, Suite 341, Palm Harbor, Florida, 34684.  There

may be other defendants related to Comprehensive of Southwest FL that are part of this fraudulent scheme. In particular, upon information and belief, Comprehensive of Southwest FL is owned by and related to Defendant Comprehensive Wellness Services, Inc. Also, upon information and belief, Comprehensive of Southwest FL is related to numerous entities doing business in Florida under similar names. In particular, Comprehensive of Southwest FL, upon information and belief, is related to SLC Management & Support Services, LLC (formerly known as Comprehensive Family, LLC).

28.    Upon information and belief, Defendant Comprehensive Wellness Services, Inc. ("Comprehensive Wellness") is a corporation organized under the laws of the State of Florida, with a principal address of 6450 NW 5th Way, Fort Lauderdale, Florida 33309. There may be other defendants related to Comprehensive Wellness that are part of this fraudulent scheme. In particular, upon information and belief, Comprehensive Wellness owns and is related to Defendant Comprehensive of Southwest FL. Also, upon information and belief, Comprehensive Wellness owns and is related to numerous entities doing business in Florida under similar names. In particular, Comprehensive Wellness, upon information and belief, is related to SLC Management & Support Services, LLC (formerly known as Comprehensive Family, LLC).

29.    Upon information and belief, Defendant Infinity Home Care, LLC ("Infinity") is a limited liability company organized under the laws of the State of Florida, with a principal office for the transaction of business located at 6700 Professional Parkway West, Sarasota, Florida 34240. There may be other defendants related to Infinity that are part of this fraudulent scheme. In particular, upon information and belief, Infinity is related to Infinity Home Care Acquisition Corp., Infinity Home Care Of Broward, LLC, Infinity Homecare of

District 9, LLC, Infinity Homecare of Jacksonville, LLC, Infinity Homecare of Lakeland, LLC,

Infinity Homecare of Ocala, LLC, Infinity Homecare of Pinellas, LLC, Infinity Homecare of

Polk, LLC, and Infinity Homecare of Port Charlotte, LLC.

30.     Upon information and belief, Defendant Infinity Home Care Of Port

Charlotte, LLC ("Infinity of Port Charlotte") is a limited liability company organized under the

laws of the State of Florida, with a principal office for the transaction of business located at 3028

Caring Way, Unit 4, Port Charlotte, Florida 33952.  There may be other defendants related to

Infinity that are part of this fraudulent scheme.  In particular, upon information and belief,

Infinity is related to Infinity Home Care, LLC , Infinity Home Care Acquisition Corp., Infinity

Home Care Of Broward, LLC, Infinity Homecare of District 9, LLC, Infinity Homecare of

Jacksonville, LLC, Infinity Homecare of Lakeland, LLC, Infinity Homecare of Ocala, LLC,

Infinity Homecare of Pinellas, LLC, and Infinity Homecare of Polk, LLC.

31.     Upon information and belief, Defendant Nurse On Call, Inc., ("Nurse On

Call") is a corporation organized under the laws of the State of Delaware, with a principal office

for the transaction of business located at 1926 10th Avenue North, Suite 400, Lake Worth,

Florida, 33461.  There may be other defendants related to Nurse On Call that are part of this

fraudulent scheme.  In particular upon information and belief, Nurse On Call is related to Nurse-

On-Call Home Care, Inc., Nurse-On-Call of Broward, Inc., and Nurse-On-Call of South Florida,

Inc.

32.     Upon information and belief, Defendant Nurse-On-Call Home Care, Inc.,

("Nurse-On-Call Home Care") is a corporation organized under the laws of the Florida, with a

principal address of 7332 Office Park Place, Suite 201 & 202, Melbourne, Florida, 32940-8541,

with a mailing address of, and registered agent at, 926 10th Avenue North, Suite 400, Lake

Worth, Florida, 33461.  There may be other defendants related to Nurse-On-Call Home Care that are part of this fraudulent scheme.  In particular, upon information and belief, Nurse-On-Call Home Care is related to Nurse-On-Call, Inc., Nurse-On-Call of Broward, Inc., and Nurse-On-Call of South Florida, Inc.

## Jurisdiction and Venue

33.     Defendants are doing business and are authorized to do business in this District and elsewhere in Florida and are subject to this Court's jurisdiction.

34.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. section 1331 and 31 U.S.C. section 3732, both of which specifically confer jurisdiction on this Court for actions under the FCA (*i.e.*, under 31 U.S.C. sections 3729 and 3730).

35.     Venue is proper in this jurisdiction under 31 U.S.C. section 3732(a) because defendants can be found and/or transact business within the Middle District of Florida, and because violations of 31 U.S.C. sections 3729 and 3730 alleged in the Complaint occurred within this judicial district.  Venue is also proper pursuant to 28 U.S.C. sections 1391(b) and (c).

## Additional Allegations of Fact

36.     Home health care includes services such as skilled nursing, physical therapy, occupational therapy, and speech therapy, among other things, provided in the patient's home or place of residence, including assisted living facilities.

37.     Medicare statutes and regulations govern the provision of, and billing for, home health services.

38.     Medicare regulations require that a physician (here, Dr. Conrado) certify that home health care services are appropriate.  *See* 42 C.F.R. §§ 409.42; 409.44; 424.22.

39.    Home health services are covered by Medicare *only* if they are furnished by a home health agency ("HHA") participating in Medicare and acting on a physician's certification that the patient: (a) is confined to the home; (b) needs skilled nursing care on an intermittent basis, needs physical or occupational therapy, or speech-language pathology services; (c) is under the care of a physician, who established the Plan Of Care ("POC"); and (d) the POC is reviewed at least every 60 days by a physician. *See* 42 C.F.R. §§ 409.42; 424.22; Medicare Benefit Policy Manual, Ch. 7, § 30.

40.    Also, as of January 1, 2010, the physician responsible for performing the initial certification must document that a face-to-face patient encounter — related to the reason for needing the home health services — occurred no more than 90 days prior to the start of care or within 30 days after the start of care. The physician must include the date of the encounter and an explanation as to why the clinical findings of the encounter support that the patient is homebound and in need of services. *See* 42 U.S.C. § 1395f(a)(1)(C); 42 C.F.R. § 424.22(a)(v).

41.    The face-to-face encounter can be performed by a nurse practitioner, clinical nurse specialist, certified nurse midwife, or physician assistant. *Id*. at § 424.22(a)(v)(A). If anyone other than the certifying physician performs the face-to-face encounter, however, that person must communicate the results of that encounter to the certifying physician. *Id*. at § 424.22(a)(v)(C).

42.    The physician responsible for certifying the patient for home care must document the face-to-face encounter on the certification, and the documentation must be signed by the certifying physician. *Id*. at § 424.22(a)(v)(F).

43.    The certification must be obtained at the time the POC is established or as soon thereafter as possible. *Id*. at § 42 C.F.R. 424.22(a)(v)(2).

44. If any services are provided based on a physician's verbal order, the verbal order must be (a) put in writing, and (b) signed and dated by the physician before the HHA bills Medicare for the care. *Id.* at § 409.43(d)

45. The POC must be reviewed by a physician every 60 days, and each review of a POC must contain the signature of the physician who reviewed it and the date of review. *Id.* at §§ 409.42(d), 409.43(e), 424.22(b). Any changes to the POC must also be signed and dated by the physician. *Id.* at § 409.43(c)(4).

46. The POC may be transmitted by facsimile, and HHAs are not required to have the original physician signature on file. The HHA is responsible for obtaining an original signature if later required. *See* Medicare Benefit Policy Manual, Ch. 7, § 30.2.7. Electronic signatures are acceptable, if they are "appropriately authenticated and dated." *Id.* at § 30.2.8.

47. Generally, a provider must obtain the required certification and recertification statements and keep them on file for verification, if necessary, and also certify, on the appropriate billing form, that the statements have been obtained and are on file. *See* 42 C.F.R. § 424.11(a).

48. Medicare's guidance about HHAs responsibilities with respect to certifications states that, prior to billing, HHAs "should ensure that all certifications are complete, to include the face-to-face documentation that has been clearly titled, dated, and signed by the certifying physician." A Physician's Guide to Medicare's Home Health Certification, including the Face-to-Face Encounter, CMS Medicare Learning Network (April 30, 2014).

49. Notably, the Office of the Inspector General's ("OIG's") "compliance guidance" for HHAs identifies as a "risk area" the areas of "falsified plans of care" and "forged

physician certifications on plans of care." The OIG states that HHAs "should take all reasonable steps to ensure that claims for home health services are ordered and authorized by a physician." OIG Compliance Program Guidance for Home Health Agencies, 63 Fed. Reg. 42410 (Aug. 7, 1998).

50.     The HHA must consult with the physician for additions or modifications to the POC, and the POC should be reviewed by the physician and the HHA as often as the patient's condition requires. *See* 424 C.F.R. § 484.18.

51.     The scheme here involves defendants defrauding Medicare by knowingly accepting a physician's signature forged by Kowalski, bypassing the required physician involvement in the approval of the POC, and then causing false claims for health care services that were never properly authorized by a physician to be submitted to Medicare.

52.     Kowalski, who has worked in the home health-related industry for many years, travels to various assisted living and rehabilitation facilities and, on behalf of her collaborating physician, Dr. Conrado, visits patients and assesses whether they are in need of home health services. Kowalski is very well-known in the Fort Myers area and visits a large number of facilities.

53.     As an ARNP, Kowalski is entitled to write "orders," which are akin to prescriptions, for home health services. Once she writes an order, it is as if her collaborating physician has determined that a particular patient needs certain home health services.

54.     She then provides the facility with her order, and the facility chooses the HHA it wishes to perform the services.

55. Once it receives the order, the HHA prepares a POC. The POC in detail specifies the treatment, drugs, rehabilitation, therapy, etc., designed for a particular patient in accord with Kowalski's order.

56. *Notably, pursuant to Medicare regulations, the POC must be certified and signed by the collaborating physician.*

57. Here, this is Dr. Conrado.

58. In other words, Kowalski is authorized to make an initial determination of the home health services needed and to prepare an order, reduced by the HHA into a POC. *Dr. Conrado, however, must actually certify the completed POC before the services can be provided by the HHA.* If this is not done, Medicare payment is not properly triggered.

59. Similarly, after 2010, the attesting physician must also certify there was a face-to-face encounter during specific time limits to substantiate the POC.

60. HHAs, like those here, have an interest in having the POCs signed and certified by the physician as soon as possible. The reason for this is straightforward. As soon as the POC is signed and certified by the physician, the HHA can submit it to Medicare and receive what it refers to as a "WRAP," which is a 60% partial payment for the POC services.[1]

---

[1] Each POC is assigned a dollar value according to a grid of services provided by Medicare to determine the level of payment. The average POC is about $4,000 per 30-day period. Some are as high as $10,000.

61.     The usual practice in the industry is that the HHA collects the POCs and hand-delivers them to the collaborating physician's office.  They then retrieve the *physician-signed* POCs, usually a week or two later.  Sometimes it takes longer.

62.     But here, the HHAs engaged in a practice of delivering the POCs for Kowalski's orders directly to Kowalski, as opposed to the physician, in a folder with Dr. Conrado's name on it.

63.     In furtherance of the scheme, Kowalski then forges Dr. Conrado's name and certification.  She then returns the signed POCs to the HHA, usually in a day, or sometimes the same day.

64.     Dr. Conrado has had a collaborative practice agreement with Kowalski for 12 years.  The fraud has been going on for more than a decade.

65.     Examples of the types of documents forged by Kowalski include POCs, documentations of face-to-face encounters, physician orders, and verbal orders.

66.     A few examples of patients as to whom forged documents were made include:

      a.     I.R., a patient of defendant Brookdale Home Health, which received a forged physician verbal order from Kowalski, dated July 25, 2014;

      b.     R.D.M., a patient of defendant Brookdale Home Health, which received a forged face-to-face-encounter physician certification from Kowalski, dated December 14, 2013;

- 14 -

c.    H.W., a patient of defendant Infinity Home Care of Port Charlotte; which received a forged face-to-face-encounter physician certification from Kowalski, dated April 10, 2014; and

d.    R.P., a patient of defendant Nurse On Call, which received from Kowalski an addendum to a plan of treatment with a forged physician signature, dated September 4, 2014;

67.    These patients are merely four among thousands of Medicare patients, who, during a twelve-year span, received fraudulently approved health care services under the defendants' scheme.

68.    Further evidence that Kowalski is forging Dr. Conrado's signature can be found on an order that another HHA, Family Home Health Services, LLC, had sent to Kowalski for Dr. Conrado's signature. On the bottom of the third page of this order, Kowalski accidentally signs her own name, crosses it out, then forges Dr. Conrado's signature alongside her crossed-out signature. The forged signature is dated July 2, 2014.

69.    The HHA defendants in this case had the requisite knowledge under the FCA that the physician certifications were forged. For example, the HHAs failed to take reasonable steps to confirm the legitimacy of Dr. Conrado's signature, as required by Medicare guidelines and regulations. Second, the HHAs failed to follow the industry practice of ensuring delivery of the POCs and related records to Dr. Conrado for his signature. Instead, the HHAs presented Kowalski with an opportunity for fraud by delivering the POCs and related records to her. Third, the HHAs processed POCs and related records that were incomplete. In numerous instances, the entire face-to-face encounter section was left blank. Fourth, the HHAs' agents or

employees admitted that they had actual knowledge that Dr. Conrado's signature was being forged by Kowalski.

70.     In some instances, information was filled out on the forms, but the HHAs never checked with Dr. Conrado or followed up with him about the POC or modifications to it.

71.     Kowalski has *admitted* to the relators that she was forging Dr. Conrado's signatures.

72.     In addition, the relators know specific HHA representatives who have said that they know Kowalski is signing the documents – and not Dr. Conrado.  They include Hilda Posada of Infinity and Holly Crider of Nurse On Call.

73.     Furthermore, when Kowalski visits various assisted living and rehabilitation facilities to assess whether the patients are in need of home health services — and as Kowalski prepares to write orders for those services — an HHA representative often shadows Kowalski for the purpose of ensuring the patient is referred to the representative's HHA and influencing Kowalski regarding the contents of her orders and the subsequent POCs.  This practice is commonly known as "following" or "rounding."

74.     Kowalski gets paid when writing an order.  Kowalski is also entitled to get paid for any visits where she is supervising or checking on the POC during the course of a month or the period of the plan.

75.     Kowalski gets paid when visiting a patient to prepare an order.  Kowalski is also entitled to get paid for any visits where she is supervising or checking on the POC during the course of a month or the period of the plan.

76.     Kowalski was also given access to the HHAs' internet portals (*i.e.*, secure, online gateways to POCs and/or related patient records) where she forged Dr. Conrado's electronic signature on occasion.

77.     Defendant Brookdale Home Health recently asked for a meeting with Dr. Conrado and Kowalski to resolve some billing issues. After learning this, Kowalski sent relator Clark a text message, asking Clark to help her complete backlogged billing as fast as possible in case Dr. Conrado discovered, as a result of the requested meeting, that Kowalski had been forging his signature. The text message from Kowalski to Clark reads: "I think u should bill for all the back ones from a year ago & all the ones he doesn't c. It would still be some money . . . ."

78.     The HHAs have an obligation to ensure, to a reasonable extent, and to take reasonable efforts to ensure, that the signatures they receive are legitimate, and that the POCs are legitimate. The fact that the POCs are sent directly to Kowalski, and that Dr. Conrado apparently has not been contacted directly by the HHAs for re-certifications, supports the requisite FCA intent by the HHAs to submit false Medicare claims.

79.     The defendants in this fraudulent scheme acted in concert with one another. Kowalski served as the hub, individually dealing with each of the corporate defendants.

80.     As set forth above, Kowalski has "caused" false claims to be submitted.

81.     The HHA corporate defendants here, Ace Homecare LLC; Brookdale Home Health, LLC (formerly known as Innovative Senior Care Home Health of Tampa, LLC), Brookdale Senior Living, Inc., Comprehensive Home Care Of Southwest Florida, LLC, Comprehensive Wellness Services, Inc., Infinity Home Care, LLC, Infinity Home Care of Port Charlotte, LLC, Nurse On Call, Inc., and Nurse-On-Call Home Care, Inc., submitted false claims.

- 17 -

82.     42 C.F.R. § 424.22(a)(1), entitled "content of certification," states that, as a "condition of payment" for home health services under Medicare, *a physician must certify the patient's eligibility.* By failing to properly verify Dr. Conrado's signature or ensure the legitimacy of documents and re-certifications, the HHA defendants knowingly and falsely certified compliance with a condition of payment.

83.     Medicare, upon information and belief, has paid these false and fraudulent claims.

84.     Any intermediate claims for services by Kowalski or any other physicians on her behalf where the POC was false and fraudulent are similarly false claims. In other words, if the underlying POC was procured by fraud, the maintenance visits are also fraudulent.

85.     The corporate defendants have the requisite knowledge of these practices under the FCA.

86.     The frauds are ongoing.

## Count I

### Substantive Violations of the False Claims Act
### [31 U.S.C. §§ 3729(a)(1)(A), (B), and (G) (and predecessor versions of the FCA)]

87.     Waldman and Clark repeat and reallege each allegation of numbered paragraphs 1 through 87 of this Complaint as part of this First Cause of Action.

88.     Defendants, together with their agents, employees, and co-conspirators, presented and caused to be presented to the United States of America knowingly false and fraudulent claims for payment and knowingly created and made false records in connection with such fraudulent and false submissions.

89.     In addition, defendants knowingly made, used, and/or caused to be made or used false records and/or statements to conceal, avoid, or decrease resulting obligations to repay the United States for these cost reimbursements.

90.     Defendants also knowingly concealed or knowingly and improperly avoided or decreased obligations to return money to the United States.

91.     As a result of the knowingly false and fraudulent claims submitted by defendants, together with their agents, employees, and co-conspirators, the United States of America paid defendants for improper charges.

92.     As a result of defendants' knowing conduct and fraudulent charging, the United States of America has paid substantial amounts of money, which total, at this time, is unknown but which can be expected to equal or exceed many tens of millions of dollars.

93.     As a result of the knowingly fraudulent conduct of defendants, together with that of their respective agents, employees, and co-conspirators, defendants are liable to the United States of America for the amount of the payments made to them, trebled, plus penalties, interest, and attorneys' fees under the FCA.

## Count II

### False Claims and Conspiracy
### [31 U.S.C. § 3729(a)(1)(C) (and predecessor versions of the FCA)]

94.     Waldman and Clark repeat and reallege each allegation contained in paragraphs 1 through 94 of this Complaint as part of this Second Cause of Action.

95.     Kowalski conspired with each of the corporate defendants, and their employees and agents, to defraud the United States of America by causing false and fraudulent

claims to be submitted and by knowingly making and submitting costs for reimbursement to which they were not entitled.

96.    In furtherance of the conspiracy, defendants created records and documents substantiating their improper billing, knowing that information to be false and untrue, with the intent to defraud the United States of America.

97.    Based upon the false and fraudulent claims submitted by defendants, the United States of America paid defendants sums to which they were not entitled under law.

98.    As a result, the United States of America has sustained substantial damages directly related to payments made to defendants based upon false and fraudulent claims, and defendants are therefore liable to the United States of America for the amount of such payments trebled, together with penalties, interest, and the costs of this action, including attorneys' fees, as provided for by the FCA.

### Jury Demand

Waldman and Clark demand a jury on all issues and matters triable by a jury.

### Relief Requested

WHEREFORE, the United States of America *ex rel.* Waldman and Clark demand judgment against defendants as follows:

    a)    On the first cause of action, for treble damages under 31 U.S.C. §§ 3729(a)(1)(A), (B), and (G) (and predecessor versions of the FCA) in an amount to be determined at trial, plus penalties, costs, interest, expenses, and attorneys' fees;

    b)    On the second cause of action, for treble damages under 31 U.S.C. § 3729(a)(1)(C) (and predecessor versions of the FCA) in an amount to be determined at trial, plus penalties, costs, interest, expenses, and attorneys' fees;

    c)    On the first and second causes of action, for the damages sustained by the United States of America; and

d)     For award of such other and further relief as this Court deems proper as a
matter of law or under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*,
including fees, costs, and expenses pursuant to Section 3730(d).

Dated:  December 11, 2014

**STOVASH, CASE & TINGLEY, P.A.**
*Attorneys for Lawrence Waldman and Patricia
Clark*

By: _____

Amy S. Tingley, Esquire
Florida Bar Number 0068871
Email: atingley@sctlaw.com
Matthew J. Pearce
Florida Bar No. 0108368
Email: mpearce@sctlaw.com
The VUE at Lake Eola
220 North Rosalind Avenue
Orlando, Florida 32801
Telephone:  (407) 316-0393
Telecopier:  (407) 316-8969

*Pro hac vice* motion to be filed on behalf of:

**HODGSON RUSS** LLP
*Attorneys for Lawrence Waldman and Patricia
Clark*

Daniel C. Oliverio, Esq.
John L. Sinatra, Jr., Esq.
Reetuparna Dutta, Esq.
Aaron M. Saykin, Esq.
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, NY 14202-4040
Telephone: (716) 856-4000

- 21 -